IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MIN HUANG, QIONG DAI, and JIAYIN DONG, <br><br> *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, Attorney General of Texas, in his Official Capacity, only. <br><br> *Defendant*. | Case No. 25-cv-1509 |

## CLASS ACTION COMPLAINT

## I. INTRODUCTION

1.      This lawsuit challenges a new Texas law, SB 17, that imposes discriminatory prohibitions on the ownership and purchase of real property based on race, ethnicity, and national origin, including prohibitions applied to Chinese citizens. *See* Texas SB 17 (2025) (to be codified at Tex Civ. Prac. And Rem. Code § 64.001(a), Tex Prop. Code §§ 5.005, 5.251-258). The Named Plaintiffs—three individual Chinese citizens who reside in Texas—are subject to the law's restrictions and its broad effects. They will be unable to rent (and therefore continue to live, study, and work) in Texas, and unable to purchase second homes or investment properties. The law stigmatizes them and their communities, and casts a cloud of suspicion over anyone of Chinese descent who seeks to buy property in Texas.

2.      Under this discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China will be prohibited from purchasing various forms of property in Texas. A similar rule will apply to people who are domiciled in Iran, Russia, North Korea, or other countries that may be listed in the future in the Annual

Threat Assessments of the Director of National Intelligence, or selected by the Governor of Texas. People who acquire property in violation of the law are subject to divestiture, criminal charges, imprisonment, and fines.

3.      This law is unconstitutional. It violates the equal protection and due process guarantees under the U.S. Constitution; it intrudes on the federal government's power to superintend foreign affairs, foreign investment, and national security; it is vague in its scope; and it recalls the wrongful animus of similar state laws from decades past—laws that were eventually struck down by courts or repealed by legislatures.

4.      In May 1882, more than one hundred and forty years ago, the United States passed the Chinese Exclusion Act, banning all Chinese laborers from immigrating to the country for ten years. The primary reasons for the law's enactment included unwanted ethnic economic competition and the racialized theory that Chinese people were unassimilable pagans. It was the first and only major U.S. law ever implemented to prevent all members of a specific racial group from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

5.      In May 1913, one hundred and ten years ago, California enacted the "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Texas, followed suit, adopting similar Alien Land Laws restricting Asians' rights to hold land in America. The purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories.

6.      As a result of developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s. Texas repealed its Alien Land Law in 1965 on the grounds that it imposed "unreasonable and discriminatory restrictions"

and harmed efforts by the state to entice foreign investment and stimulate economic development and industrial growth.

7.    Through this action, the Class and Subclasses seek a declaratory judgment that SB 17 violates the U.S. Constitution and federal statutory law, and an injunction to stop the enforcement of the law against all members of the Class and Subclasses.

## II.  PARTIES

8.    Plaintiff Min Huang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Shanghai, China. She regularly comes to Texas on a B-1 visa, and owns property in Cypress, TX.

9.    Plaintiff Min Huang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in New Zealand. She owns a rental property in the Houston area, and would like to purchase a second one in the same area.

10.    Plaintiff Jiaying Dong Plaintiff Min Huang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Waco, TX. He is a sophomore at Baylor University, here on an F-1 visa.

## III.  JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction over this action pursuant to: 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law; 28 U.S.C. § 1343 and 42 U.S.C. § 1983 because this action seeks to redress the deprivation of and infringement upon, under color of state law, rights, privileges, and immunities secured by the U.S. Constitution or federal law providing for the equal rights of all persons within the jurisdiction of the United States; and 42 U.S.C. § 3613 because plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C. § 3601 et seq., which prohibits discrimination

in real estate transactions and invalidates conflicting state laws, and aggrieved applicants, as defined by the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.

12.    There is an actual, present, justiciable controversy between the parties within the meaning of Article III of the U.S. Constitution, as the recent enactment of SB 17 constitutes a present and continuing infringement of Plaintiffs' federal constitutional and civil rights.

13.    This Court has authority to grant declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as well as 28 U.S.C. § 1343, 42 U.S.C. §§ 1983 and 3613, and Rule 57 of the Federal Rules of Civil Procedure.

14.    In addition, this Court has authority to grant injunctive relief in this action under the All Writs Act, 28 U.S.C. § 1651, as well as 28 U.S.C. § 1343, 42 U.S.C. §§ 1983 and 3613, and Rule 65 of the Federal Rules of Civil Procedure.

15.    This Court has personal jurisdiction over Defendant Paxton, a Texas official whose office is in Austin, Texas, and who has enforcement authority over all of Texas. The Court's exercise of jurisdiction over Defendant in his official capacity as a Texas state government official is appropriate pursuant to *Ex Parte Young*, 209 U.S. 123 (1909).

16.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Mr. Paxton's official address is in Texas, and a substantial part of the events or omissions giving rise to the claims herein occurred in the judicial district in which this Court is based.

## IV.  STATEMENT OF FACTS

### A.    The enactment of HB/SB 17

17.    SB 17 and its companion measure, HB 17 were introduced in the Texas Senate and House were introduced on and February 20, 2025 (SB 17), and March 13, 2025 (HB 17).

18.    On May 11, Governor Abbott stated on X that "I will soon sign the toughest ban in the U.S. to prohibit people from hostile foreign nations like China, Russia, Iran, and North Korea from buying or owning land in Texas."

19.    On June 1, SB 17 was presented in its final form to Governor Greg Abbott. The Governor signed it on June 20. According to Governor Abbott's press secretary, Andrew Mahaleris, Governor Abbott signed the law because "Foreign threats to our country are real and we must safeguard against those who wish us harm."[1] Mahaleris referred to "Chinese nationals" who were purportedly "attempting to smuggle bioweapons in Michigan," although those accusations have nothing to do with land use.[2] The bill's author, State Senator Lous Kolkhurst, stated that "Texas is not for sale to any nation deemed a threat to our national security," and that "this is the strongest national security bill in the nation."[3] According to Kolkhurst, SB 17 is designed " to protect our land, homes, commercial buildings, water, timber, oil and gas, and rare earth materials from being bought up by foreign adversarial nations."[4]

20.    Despite the rhetoric, in 2024, Chinese foreign buyers were involved in only about 0.126 percent of all real estate purchases in Texas.[5]

---

[1] Chistina Van Wassbergen, *Texas governor signs bill critcs call modern day "alien land law",* Courthouse News Service (June 23, 2025), available at https://www.courthousenews.com/texas-governor-signs-bill-critics-call-modern-day-alien-land-law/.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5]    2024 Texas REALTORS International Residence Transactions, at 19 (foreign buyers only 2.1% of all residential transactions), 8 (Chinese buyers only 6% of foreign buyers). 2.1%*6% = 0.126%), available at https://www.texasrealestate.com/wp-content/uploads/Texas-Intl-Residential-Report-2024.pdf.

21.     None of the law itself nor the statements of Kolkhurst or Mahaleris provide any evidence that Chinese buyers of property in Texas are agents of the Chinese Communist Party or have caused harm to national security. Indeed, the State of Texas has failed to identify any nexus between real estate ownership by Chinese citizens in general and purported harm to national security.

22.     SB 17 prohibits most ownership, and all leasing, of various forms real estate by Chinese buyers going forward.[6]

23.     Specifically, SB 17 prohibits Chinese citizens, agents, and members of the Chinese communist party from purchasing or leasing land in Texas, subject to certain exceptions. Tex. Prop. Code §§ 5.253, 5.253(4). Exceptions include Chinese Citizens who are also U.S. citizens or permanent residents (who are exempted from SB 17 outright), Tex. Prop. Code. § 5.252(1), as well as Chinese citizens who are lawfully present in the United States, but not U.S. citizens or permanent residents, and are somehow still domiciliaries in the United States. Tex. Prop. Code. §§ 5.253(4)(A)-(B).

24.     The term "domicile" is not defined, but under Texas law, it typically means the last place one resided in that one intended to make their permanent home. *See Gerlacher v. Board of Regents of University of Houston System,* 1997 WL 251343, at *2 (Ct. App. Tex. 14th Dist. May 15, 1997). Because of the requirement of permanence, it likely cannot generally apply to those who are not U.S. citizens or lawful permanent residents.

---

[6] The law does not prohibit current owners of Texas property from continuing to own that land, but it does prohibit them from passing that law on to other Chinese persons covered by the bill, including their own family members, and even by way of inheritance. The law similarly would prohibit a Chinese person covered under the law from passing title of property to any company he owns or creates.

25.    The law also excludes (again, other than Chinese agents and members of the Chinese Communist Party, here legally) Chinese citizens who are who are domiciliaries of a third country for which they have been made a naturalized citizen. Tex. Prop. Code. §§5.253(4)(B). The law and its prohibitions further apply to any company or organization majority-owned or under the control of a covered Chinese person, headquartered in China, "directly or indirectly controlled" by the Chinese government. Tex. Prop. Code. §§ 5.253(1)-(3).

26.    The law also applies in similar fashion to Iran, North Korea, and Russia, Tex. Prop. Code. § 5.251(3)(A). Countries can be added to or deleted from the law's restrictions based on either the Annual Threat Assessments of the U.S. Intelligence Committee, Tex. Prop. Code. § 5.251(3)(A), or the Governor's whim, *id.* § 5.254(a)(2). The Governor may separately declare entities or groups "a transnational criminal organization" and subject their members, however that may be determined, to the law's prohibitions as well. Tex. Prop. Code. § 5.254(a)(2). The Governor may separately designate or remove any company or organization from the law's reach, Tex. Prop. Code. § 5.253(2)(d), unless that company or organization is owned by U.S. citizens or lawful permanent residents and there is no ownership interest or control by any entity or organization covered by SB 17, Tex. Prop. Code. § 5.252(2).

*27.*    Breaching SB 17 constitutes both a civil violation and a criminal violation with the potential for incarceration, Tex. Prop. Code. §§ 5.258-259. A court, at the request of the Attorney General, must seize and sell off property or cancel leases when the purchase or lease violates SB 17. Tex. Prop. Code. § 5.257. Although Texas law is unclear (as this is a new

cause of action), typically in rem seizures do not require any pre-seizure notice of the property to the owner. *See, e.g.,* Tex. Crim. Pro. Art. 59.04(b).

28.     The law also gives the Attorney General substantial power to investigate and enforce violations of the law, record notices on property, adopt rules for implementation of SB 17, and refer violations to other law enforcement. Tex. Prop. Code. § 5.256.

29.     SB 17 is more draconian than a recent Florida version, which at least had certain exceptions for obtaining property by inheritance, or collection of debts, at least so long as they sold or otherwise divested themselves of the property in three years. In comparison, Texas's law would prohibit a Chinese person covered by the law from obtaining property by inheritance or debt collection outright, requiring them to forfeit property at severe financial cost. And although Texas's law permits some Chinese people covered by the law from purchasing a single home to be used as a homestead, it simultaneously forbids Chinese people covered by the law from even leasing a home to live in, if the lease is for a year or more. Tex. Prop. Code § 5.252(3).

30.     Critically, a motions panel of the 11th Circuit found the Florida law "preempted by federal law, specifically 50 U.S.C. § 4565, the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA")." *Shen v. Simpson*, 23-12737 (Dkt. 59, at 2) (11th Cir. Feb. 1, 2024). One judge would have also found the law violated the Equal Protection Clause. *Id.* (Abudu, J., concurring) (the majority opinion was silent on this issue).

31.     The new landownership restrictions went into effect in Texas on September 1, 2025. Tex. Prop. Code §§ 5.251-5.259; SB 17 at § 8.

**B.     The impact of HB/SB 17 and the harm it is causing Chinese people in Texas**

32.     Named Plaintiffs and Class and Subclass Plaintiffs in this action are people

living in Texas and a Texas-based real estate company who are currently suffering, or imminently will suffer, the direct impact of SB 17.

33.    As detailed below, the Named Plaintiffs and Class and Subclass Plaintiffs in this case lawfully reside in either Texas or China but may be considered domiciled in China or Iran due to their nonimmigrant visa status under U.S. immigration law.

34.    The term "domicile" is defined int SB 17 the same way it is defined under Texas law more generally. *See Gerlacher v. Board of Regents of University of Houston System*, 1997 WL 251343, at *2 (Ct. App. Tex. 14th Dist. May 15, 1997). Individuals attending schools in Texas are not considered to be domiciled there unless they both resided in Texas for at least a year before enrollment and intended to make that residence a permanent home for at least a year before enrollment. *Id.* Under Texas law, students on an F-1 visa and visitors on a B-1 visa cannot be deemed to be domiciled in Texas.

35.    Thus, the Named Plaintiffs and Class and Subclass Plaintiffs, by virtue of having nonimmigrant visas, cannot be said to have established permanent residency in the United States, and therefore SB 17 considers them to be domiciled in their country of origin.

36.    Plaintiff Min Huang is a citizen of China. She is neither a citizen nor a permanent resident of the United States, and in fact, lives in Shanghai China.

37.    Ms. Huang has worked in hotel and international trade businesses. She now provides consultation services to Chinese citizens who are interested in obtaining United States green cards through the EB-5 investment immigration program. She also assists Chinese clients with diversifying assets through the United States, including buying investment properties in the United States.

38.    In 2018, Ms. Huang, along with some friends, jointly bought an investment

property in the Houston, Texas area. She now rents that property out. Her mother (also a Chinese citizen living in China) also bought two similar investment properties, which Ms. Huang now co-owns with her mother.

39.     Ms. Huang occasionally visits the United States on a B-1/B-2 business visitor visa.

40.     Ms. Huang plans to purchase additional properties in Texas. She has a plan to visit with Texas real estate agents this October.

41.     Because of SB 17, she will be banned from purchasing property in Texas. Also, because of SB 17, it is unlikely she will be able to find appropriate financing for any purchase, because lenders will not want to lend to Ms. Huang when there is a risk that the collateral for such a loan will be seized by the Attorney General.

42.     Plaintiff Qiong Dai is a citizen of China. She is neither a citizen nor a permanent resident of the United States, and in fact, lives in New Zealand, where her daughter goes to middle school.

43.     Ms. Dai owns a rental property in the Houston, Texas area.

44.     Ms. Dai held a B-1/B-2 visa from 2015 through 2025. She plans on obtaining a new B-1/B2 visa to continue managing her investment business.

45.     Ms. Dai would like to purchase a second investment property in the Houston area. But she is prohibited from doing so because of SB 17.

46.     Mr. Jiayin Dong is a citizen of China. He is neither a citizen nor a permanent resident of the United States. He lives in Waco, TX, where he is a Sophomore at Baylor University.

47.    Mr. Dong moved to Waco from China in August 2024, for the purposes of attending school here.

48.    Mr. Dong is lawfully present in the United States under an F-1 visa.

49.    Mr. Dong plans on living in the Waco area until May 2028, when he hopes to graduate from Baylor with a degree in Computer Science.

50.    Mr. Dong's current lease expires in July 2026. At that point, he hopes to enter into a new lease.

51.    While leases under a year exist in the Waco area, having to choose from a property that offers a less-than-one-year lease limits his options and increases the potential rent. Most landlords prefer longer term leases.

52.    Mr. Dong has no firm plans as to what he will do when he graduates.

53.    As a result of Texas's New Alien Land Law, there is a substantial likelihood that sellers and lessors of real estate will discriminate against Plaintiffs and other people of Chinese descent even for transactions that are permitted, as sellers will seek to broadly avoid Chinese buyers given the penalties imposed for selling property in violation of the new law and the possibility of undoing transactions. Of course, sellers have no real way or reason of knowing whether a buyer is a member of the Chinese Communist Party or Government.

54.    Finally, SB 17 is having and will have far-reaching stigmatizing effects among people of Chinese, and Asian descent in Texas, including Plaintiffs, as Texas law deems them a danger to the United States. This impact is exactly what laws like the Chinese Exclusion Act of 1882 and the California Alien Land Law of 1913 did more than a hundred years ago.

C.    **The Federal Government's role in foreign affairs, foreign investment, and national security**

55.    The federal government manages foreign affairs, foreign investment, and

national security in the United States, including through the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and under the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. 115-232.

56.     CFIUS was established on May 7, 1975, by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. Upon its establishment, CFUIS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including real estate transactions. CFUIS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment as necessary.

57.     Later, Congress enacted the Exon-Florio amendment to the Defense Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425–26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan then delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake investigations, and make recommendations with respect to foreign investment data and policies. E.O. 12661, 54 F.R. 779. By 1991, the Department of the Treasury promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. Part 800.

58.    The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463–65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, in particular, those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

59.    Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA also expanded the national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

60.    Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701–28, 132 Stat. 2174–2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign investments. Most notably, CFIUS was granted jurisdiction to review certain real estate transactions by foreign persons, specifically, those in close proximity to a military

installation, or to a U.S. government facility or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or declared a strategic goal of acquiring a type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFUIS's use of risk-based assessments to determine whether certain transactions pose threats to national security. And only the President has the power to prohibit transactions in the CFIUS scheme. CFIUS can recommend mitigation measures or approve transactions, but the prohibition power is vested in the President alone.

61.     At the same time, Congress took several deliberate measures to calibrate the regulation of real estate purchases. For example, Congress specifically constrained the President's power to prohibit transactions by exempting those involving only "a single 'housing unit'"—a house, an apartment, etc. 50 U.S.C. § 4565(a)(4)(C)(i); *see* 31 C.F.R. §§ 802.223 (defining term), 802.216 (includes "adjacent land" incidental to use as housing unit). That express statutory exception reflects the marginal national security implications of such transactions and the outsized economic, personal, and foreign policy implications of policing the purchases of foreign nationals' homes. In addition, the federal process is individualized, with the government reviewing *particular* transactions and purchasers to assess whether they pose any national security threat. *See* 50 U.S.C. § 4565(d)(4). And penalties for violations of the rules are carefully calibrated.  Criminal liability attaches only where a person has made false statements to CFIUS. 31 C.F.R. § 802.901(a)–(c), (g).

62.     It simply belies any belief that Congress would prevent the President, acting for reasons of national security, from prohibiting a real estate transaction involving a single housing unit, while permitting the Texas Attorney General that same power.

## V.     CLASS ACTION ALLEGATIONS

63.     Plaintiffs reallege and incorporate by reference the allegations contained in the above paragraphs as though fully set forth herein.

64.     Federal Rule of Civil Procedure 23(b)(3), Plaintiffs assert claims on behalf of the following Classes:

a.     **The SB 17 Class:** All people and entities who are covered by the law, that is, all citizens, members of ruling political parties, and agents of China, Iran, Russia, and North Korea (plus or minus, over time, any country added or removed from the list of designated countries), who are not United States citizens or lawful permanent residents, as well as all company or organization majority-owned or under the control of a person covered by the law, headquartered in a covered country, or "directly or indirectly controlled" by a covered government (represented by all Named Plaintiffs).

b.     **The Chinese subclass:** All individuals and entities under the purported primary class who are covered by SB 17 because they are Chinese (represented by all Named Plaintiffs).

c.     **The lawfully-present non-permanent residents subclass**: All members of the SB 17 class who are not here unlawfully, are not agents of a designated state, are not members of a designated organization, and are not members of the

ruling party of a designated state, or owned by such members as ownership is defined in SB 17 (represented by all Named Plaintiffs).

d. **The investor subclass**: All members of the SB 17 class who would like to purchase property not covered by the Homestead Exception (represented by Ms. Dai and Ms. Huang).

65. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into different subclasses, or modified in any other way.

66. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(2). Plaintiffs seek to represent ascertainable Classes, as determining inclusion in the classes can be done by the text of SB 17 itself.

67. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Classes number at least in the hundreds and is therefore so numerous that joinder of all members would be impracticable.

68. Questions of law and fact common to the putative Classes and Subclasses exist that predominate over questions affecting only individual members, including:

a. Whether SB 17 is preempted by CFIUS/FIRRMA or the FHA.

b. Whether SB 17 violates the Equal Protection Clause by discriminating on the basis of race, ethnicity, color, and national origin.

69. Plaintiffs are members of the putative Classes and Subclasses. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes and Subclasses, as the claims arise from the same course of conduct by the Defendant

and the relief sought is common.

70.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes and Subclasses, as their interests are coincident with, not antagonistic to, the other members of the Classes and Subclasses.

71.    Plaintiffs have retained counsel competent and experienced in both civil rights and class action litigation.

72.    Certification of the Classes is appropriate pursuant to Fed. R. C. P. 23(b)(2) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.  Absent a class action it would be unlikely that many members of the Classes would be able to protect their own interests because the cost of litigation through individual lawsuits is high and no financial recovery is sought.

73.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

74.    The prosecution of separate actions by the individual members of the proposed Classes and Subclasses would create a risk of inconsistent adjudications.

75.    The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which

would substantially impair their ability to protect their interests.

76.    Texas has acted on grounds generally applicable to the proposed Classes and subclasses, thereby making appropriate final and injunctive relief with respect to the members of the proposed Classes and Subclasses as a whole.

<u>**COUNT ONE**</u>

**Violation of the Supremacy Clause of the U.S. Constitution**
**Preemption by federal regimes governing**
**immigration, foreign affairs, foreign investment, and national security**
**(On behalf of the Class, the Legally-Present Subclass, and Investor Subclass)**

77.    Plaintiffs reallege and incorporate by reference the allegations contained in the above paragraphs as though fully set forth herein.

78.    The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

79.    The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

80.    Pursuant to the Supremacy Clause, SB 17 is preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment transactions with respect to national security concerns, as well as to review real estate transactions by foreign

persons, specifically, those pertaining to properties in close proximity to military installations, U.S. government facilities, or properties of national security sensitivity.

81.    It is unquestionable that foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. Indeed, the U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

82.    The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof, especially with respect to foreign relations with China.

83.    CFIUS and FIRRMA indicate a comprehensive scheme designed to occupy the field as to when foreigners may purchase land in the United States as a result of their foreign citizenship.

84.    All in all, given the comprehensiveness of federal schemes and the creation of multiple federal agencies to administer the schemes, federal law has "occupied" the entire field, thus precluding any state regulation.

85.    The State of Texas explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when enacting SB 17. The law's own text makes clear the law's purpose, which is to take aim against China and Chinese foreign policy. SB 17 § 1(a)(1). Accordingly, the law violates the Supremacy Clause because it regulates a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including

foreign real estate acquisitions. In so doing, the new landownership prohibitions usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take actions with respect to foreign investments, including real estate transactions, that raise issues of national security.

86.    The law effectively prohibits Chinese nonimmigrants from effectively residing in Texas, regardless of political party membership. While the law permits such nonimmigrants from purchasing a homestead, the very fact of their nonimmigrant status makes such long term ownership impractical. And the law bizarrely prohibits them from leasing a home for a year or longer. At best, it requires such members to exist in Texas solely as transients or only through what are effectively insurmountable property ownership hurdles.

87.    In addition, the new landownership prohibitions intrude upon and conflict with the federal government's power to govern foreign affairs, both generally and specifically as it relates to CFIUS and FIRRMA. By designating foreign countries for sanctions treatment, including China and Chinese people, SB 17 unconstitutionally seeks to establish its own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See, e.g.*, *Zschering v. Miller*, 389 U.S. 429 (1968).

88.    The new landownership prohibitions also intrude upon and conflict with the federal government's power to govern foreign commerce and determine the propriety of providing benefits to aliens, generally. By prohibiting individuals domiciled in certain foreign countries from acquiring property interests in Texas, the law discriminates against out-of-state individuals and entities based on race, ethnicity, color, and national origin. The new law therefore unduly burdens international commerce, especially with respect to foreign investment.

89.     SB 17 conflicts with the deliberate, delicate balance that the federal government has struck with respect to these matters, and accordingly, the statute is preempted by federal law.

90.     The enactment and pending enforcement of the new prohibitions on landownership embodied by SB 17 have caused and will continue to cause Plaintiffs ongoing and irreparable harm.

91.     In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## COUNT TWO

**Violation of the Right to Equal Protection**
**Under the 14th Amendment and 42 U.S.C. § 1983**
**(On behalf of the Class and the Chinese and Iranian Subclass)**

92.     Plaintiffs reallege and incorporate by reference the allegations contained in the above paragraphs as though fully set forth herein.

93.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

94.     The Equal Protection Clause protects all persons in the United States, regardless of their race, ethnicity, color, or national origin, including Plaintiffs.

95.     The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, ethnicity, color, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, ethnicity, color, or

national origin.

96.    The new prohibitions on landownership target Plaintiffs, who are Chinese persons. As described above, the State of Texas appears to classify Plaintiffs as effectively agents of China or Iran. As such, Plaintiffs are prohibited from acquiring land in Texas.

97.    The law further encourages discrimination against Chinese individuals even if they are not covered by the law. The law requires the divestment (including "termination of a leasehold," Tex. Prop. Code § 5.257(1)(B)), of any ownership interest by a covered entity. This discourages individuals from leasing land to anyone who might possibly be covered by the law. Rather than doing a full investigation into a Chinese applicant's immigrant status, domiciliary, and membership in a Chinese Political Party or Government, a prospective landlord would likely simply avoid leasing to individuals who looked Chinese or who had Chinese-sounding names.

98.    The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under SB 17 are based on Plaintiffs' race, ethnicity, color, and national origin.

99.    SB 17 was enacted with the purpose and intent to discriminate against persons based on race, ethnicity, color, and national origin.

100.    SB 17 impermissible classifications based on race, ethnicity, color, and national origin that are not justified by a compelling state interest.

101.    SB 17 is not narrowly tailored to meet a compelling state interest.

102.    SB 17 invidiously targets persons based on their race, ethnicity, color, and national origin, resulting in discriminatory practices and disparate treatment.

103.    SB 17 deprives Chinese persons from equal protection of the laws, including laws relating to their fundamental rights.

104.     The enactment and imminent enforcement of the new prohibitions on landownership embodied by SB 17 have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, ethnicity, color, and national origin simply because they are Chinese persons within the meaning of the new law.

105.     In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges and immunities granted under the U.S. Constitution and federal law.

## COUNT THREE

### Violation of the Supremacy Clause of the U.S. Constitution
### Preemption by the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*
### (On behalf of the Class and the Chinese and Iranian Subclasses)

106.     Plaintiffs reallege and incorporate by reference the allegations contained in the above paragraphs as though fully set forth herein.

107.     The Fair Housing Act establishes that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing through the United States." 42 U.S.C. § 3601.

108.     The Fair Housing Act applies to all "dwellings," which are defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." *Id.* § 3602(b).

109.     The protection of the Fair Housing Act extends to all persons in the United States, including Plaintiffs. Specifically, the Fair Housing Act defines "person" as including

"one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, receivers, and fiduciaries." *Id.* § 3602(d).

110.    The Fair Housing Act empowers any person who is aggrieved under the law to make a claim. *Id.* § 3613(a). The definition of "aggrieved person" includes any person who either "claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i).

111.    Under the Fair Housing Act, 42 U.S.C. § 3604, it is an unlawful discriminatory housing practice:

> (a) To refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, . . . or national origin.

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale . . . of a dwelling that indicates any preference, limitation, or discrimination based on race, color, . . . or national origin, or an intention to make any such preference, limitation, or discrimination.

> (d) To represent to any person because of race, color, . . . or national origin that any dwelling is not available for . . . sale . . . when such dwelling is in fact so available.

> (e) For profit, to induce or attempt to induce any person to sell . . . any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons

- 24 -

of a particular race, color, . . . or national origin.

112.    The Fair Housing Act also makes it "unlawful for any person . . . whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of race, color, . . . or national origin." *Id.* § 3605(a). This provision relating to "residential real estate-related transaction[s]" includes "[t]he making or purchasing of loans or providing other financial assistance . . . [and] [t]he selling, brokering, or appraising of residential real property."

113.    The Fair Housing Act expressly invalidates conflicting law: "[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615.

114.    The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Texas appears to classify Plaintiffs as disfavored people who, by the law's own words, will not have "same real and personal property rights as a United States citizen." As a result, Plaintiffs are subject to the prohibitions of SB 17 relating to real property.

115.    The law further encourages discrimination against Chinese individuals even if they are not covered by the law. The law requires the divestment (including "termination of a leasehold," Tex. Prop. Code § 5.257(1)(B)), of any ownership interest by a covered entity. The law requires the divestment (including "termination of a leasehold," Tex. Prop. Code § 5.257(1)(B)), of any ownership interest by a covered entity. This discourages individuals from leasing land to anyone who might possibly be covered by the law. Rather than doing a full

investigation to a Chinese applicant's immigrant status, domiciliary, and membership in a Chinese Political Party or Government, a prospective landlord would likely simply avoid leasing to individuals who looked Chinese or who had Chinese-sounding names.

116.     The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under SB 17 are based on Plaintiffs' race, color, and national origin.

117.     SB 17 therefore conflicts with the Fair Housing Act on the following grounds:

    a.     The law establishes a discriminatory housing practice that purports to require or permit action that would violate the Fair Housing Act, and therefore, is presumptively invalid as a matter of law.

    b.     The law requires discriminates, and requires discrimination against persons based on their race, color, and national origin, with respect to dwellings and residential real estate-related transactions.

    c.     The law invidiously targets persons based on their race, color, and national origin, resulting in discriminatory practices and disparate treatment with respect to dwellings and residential real estate-related transactions.

118.     The enactment and enforcement of the new prohibitions on landownership in SB 17 have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, color, and national origin simply because they are Chinese persons within the meaning of the new law.

## **COUNT FOUR**

**Violation of the Supremacy Clause of the U.S. Constitution**
**Preemption by the Equal Credit Opportunity Act, 42 U.S.C. § 3601 *et seq.***
**(On behalf of the Class and the Chinese and Iranian Subclass)**

119.    Plaintiffs reallege and incorporate by reference the allegations contained in the above paragraphs as though fully set forth herein.

120.    The Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq., prohibits creditors (including mortgage lenders) from discriminating "against any applicant" "on the basis of race, color, religion, national origin, sex, or marital status, or age." 15 U.S.C. § 1691(a).

121.    State laws inconsistent with the Equal Credit Opportunity Act are expressly preempted to the extent of the inconsistency. 15 U.S.C. § 1691d(f).

122.    SB 17 expressly permits the State of Texas, upon a violation of SB 17, to "divest the individual's interest in the real property through sale, termination of a leasehold, or other disposition of the interest." Tex. Prop. Code § 5.257(1)(C)(i).

123.    Creditors (including mortgage lenders) are unlikely to be willing to provide a mortgage to Chinese, Iranian, North Korean, or Russian citizens who cannot establish that they are not covered by SB 17, because of the risk that the collateral on such mortgage might be placed into receivership.

124.    Even if Chinese, Iranian, North Korean, or Russian citizens who are here on a valid nonimmigrant visa can establish a domicile in the United States, exempting them from SB 17, creditors (including mortgage lenders) are unlikely to be willing to provide them a mortgage because those creditors would not be in a position to verify that status in an economically efficient manner. This is particularly true if being domiciled in the United States turns on the subjective intent of the purchaser. Nor would a creditor be able to verify that such a person is not covered by SB 17 for a different reason, such as being a member of a ruling state's political party.

125.    Even for those who fall within the homestead exception, that exception is not

likely to prevent unlawful ECOA discrimination, because creditors are unlikely to be able to sufficiently verify that a covered individual (a) falls within the homestead exception and (b) is in fact purchasing the property for purposes of a homestead.

126.    Even if some creditors are willing to provide mortgages for people potentially covered by SB 17, they are likely to charge higher rates or fees to individuals potentially covered by SB 17. Such higher rates and fees are also a form of discrimination.

127.    In the days leading up to SB 17's effective date, at least one mortgage company put out an announcement that it would not lend to Chinese, Iranian, North Korean, or Russian who purchase real property in Texas, unless they can establish that they are a United States citizen or green card holder. *See* Exhibit A.

128.    SB 17 therefore conflicts with the Equal Credit Opportunity Act because it effectively requires creditors to discriminate on the basis of national origin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.    Declare SB 17 preempted by federal law.

B.    Declare SB 17 unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to equal protection.

C.    Preliminarily and permanently enjoin Defendants from implementing and enforcing SB 17.

D.    Award Plaintiffs reasonable attorneys' fees and their costs of suit under 42 U.S.C. § 1988(b) and any other applicable law.

E.    Grant any other relief this Court deems just and proper.

September 16, 2025                                   Respectfully submitted,

/s/ Zhanghua Lai
Zhanghua Lai
KERB LAW GROUP
13809 Research Blvd
Austin, TX 78750
512-203-2649 (no fax number)
ylai@kerblaw.com

Justin Sadowsky (VA Bar 73382)*
CHINESE AMERICAN LEGAL DEFENSE
ALLIANCE
4250 N. Fairfax Drive #600
Arlington, VA 22203
646-785-9154 (no fax number)
justins@caldausa.org


Keliang (Clay) Zhu* (CA Bar No 178170)
Andre Y. Bates* (CA Bar No 305509)
CHINESE AMERICAN LEGAL DEFENSE
ALLIANCE
7901 Stoneridge Drive #208
Pleasanton, CA 94588
925-399-6702 (no fax number)
czhu@dehengsv.com
aybates@dehengsv.com


*Motion for admission pro hac vice forthcoming